H. E. LEWIS, TRUSTEE, APPELLANT, V. G. W. HOLDREGE
ET AL., APPELLEES, AND KENT K. HAYDEN, RECEIVER,
APPELLANT.

FILED MAY 19, 1898.   No. 8080.

1. **Fraudulent Conveyances:** ASSIGNMENTS: EVIDENCE: REVIEW. The
   evidence in this case examined and found to show that the as-
   signments through which plaintiff claims an interest in the sub-
   ject-matter in controversy were fraudulent and void.

2. **Garnishment:** REVIEW. There being no evidence of the garnish-
   ment alleged by the plaintiff and denied by appellees, and the
   proofs failing to disclose that the garnishee has in hands any
   money for which he is liable to account, it is not deemed neces-
   sary to retain the case merely to settle the matter of garnish-
   ment.

APPEAL from the district court of Lancaster county.
Heard below before HALL, J.   *Reversed.*

*A. S. Tibbets, Tibbets, Morey & Ferris, L. C. Burr, Cobb &
Harvey,* and *Lamb, Adams & Scott,* for appellants.

*J. W. Deweese, F. E. Bishop,* and *G. M. Lambertson, contra.*

RYAN, C.

In the district court of Lancaster county Henry E.
Lewis began this action against George W. Holdrege
and others to obtain an adjudication of his ownership, as
trustee for the Lincoln Savings Bank & Deposit Com-
pany, of a one-tenth interest in the proceeds of the sales
of certain lands of which the title was held in trust by
G. W. Holdrege for the benefit of himself and certain
associates, of whom C. W. Mosher was one, to the extent
of one-tenth interest in the investment.   On January 21,
1893, the Capital National Bank, of which Mosher was
the president, closed its doors and afterwards went into
the hands of a receiver, and, as the evidence shows, this
receiver has so far been able to collect sufficient of its
assets to pay but fifteen per cent on its indebtedness.   At

the time the bank failed it had on deposit the sum of
$4,451.83, of which the syndicate, of which Mr. Holdrege
was a representative, was the owner.   Plaintiff, as
trustee as aforesaid, claims by his petition to be entitled
to be decreed the owner of one-tenth of this sum and of
such other sums as shall be realized for the syndicate
hereafter, and this claim he predicates on an assignment
made to the bank and deposit company by the Western
Manufacturing Company on May 19, 1894, to which latter
corporation Mosher had previously assigned his said in-
terest.   The defense of the members of the syndicate
represented by Mr. Holdrege is that plaintiff by assign-
ment obtained no right which Mosher could not have en-
forced, and that Mosher could not have enforced this
right to one-tenth of the deposit in the Capital National
Bank because of the fact that its failure was attributable
solely to its wreckage by Mosher, its president, and they
claim the money due Mosher on account of the damage
which resulted from this, his misconduct.   By denial they
also put in issue the averments of the petition.   Kent K.
Hayden, the only defendant not a member of the syndi-
cate, alleged in his answer and cross-petition that on
June 30, 1893, he, as receiver for the Capital National
Bank, commenced suit in the United States circuit court
for the district of Nebraska against C. W. Mosher, and
on July 27 thereafter garnished G. W. Holdrege, and
finally obtained judgment for the sum of $84,294.48
against Mosher, which is still unpaid.   In the case at
bar there was a judgment for the counter-claim of Mr.
Holdrege and his associates, and from this judgment
plaintiff and the receiver have appealed.

It is a matter of regret that a portion of the books of
the Western Manufacturing Company had been destroyed
by fire, so that the testimony of M. D. Welch was not as
clear and intelligible as, with the aid of the missing
books, it might have been.   Practically no other testi-
mony than that of Welch is available on the matters to
be considered, for, though Mosher's deposition was taken,

it affords no assistance. We shall not undertake to detail the testimony of Mr. Welch in full, but from it shall endeavor to glean and narrate the facts which lead us to the conclusions which we reach.

In substance M. D. Welch testified that he had been manager and secretary of the Western Manufacturing Company since September 1, 1888; that the written assignments of Mosher's interest were two in number; that the first of these was made in April, 1893, while perhaps Mosher was in the custody of the United States marshal in the city of Omaha,—but he could not explain why it was not dated,—and that the second assignment was made by Mosher in the jail at Omaha about July 21, 1893. These assignments, in the order in which they were made, were in the following language:

"ASSIGNMENT.

"For value received I hereby sell, assign, and transfer all my interest in and to the foregoing contract (that defining the objects of the syndicate and the interests of the parties thereto), and all my right thereunder, to the Western Manufacturing Company of Lincoln, Nebraska.

"CHARLES W. MOSHER."

"Know all men by these presents, that I, Charles W. Mosher, of Lincoln, Nebraska, do hereby grant, bargain, sell, and assign to the Western Manufacturing Company all of my interest in my lands lying in, formerly Keith, now Perkins county, Nebraska, and hereby convey and assign to the said Western Manufacturing Company all of my interest in all of the lands described in the attached and within contract, and all my right, title, or interest, either legal or equitable, that I have under the annexed contract. This conveyance and assignment is made by me to secure any indebtedness which I owe to the Western Manufacturing Company. As witness my hand and seal this 21st day of July, 1893.

"CHARLES W. MOSHER."

M. D. Welch in his testimony thus explained why there
were two assignments: "I held those contracts [probably
referring to the contract and first assignment attached
thereto] for two months or such a matter, and from a
remark made by Mr. Hayden, receiver of the Capital
National Bank, at one time on the streets of Lincoln
where he stated that the bank was going to garnishee
some land contracts they had found out about, I then
took those contracts to my attorney, Mr. Lamb, and asked
him if everything was all in order as there was likely to
be litigation over them, and he advised me then to have
another assignment made and record them in the coun-
ties where the land was located, and I did so under his
advice." The second of these assignments was acknowl-
edged as indicated by the above testimony. The clause
which recites that the purpose of the assignment was to
secure any indebtedness which Mosher owed to the West-
ern Manufacturing Company is significant as indicating
what was understood to be the purpose of the assign-
ment on July 21, 1893, and may be profitably borne
in mind when considering the further testimony of Mr.
Welch in respect to the contract of the Western Manu-
facturing Company with Mosher. It is not by any means
clear just what all the transactions were between Mosher,
the Western Manufacturing Company, and M. D. Welch,
but Mr. Welch did testify that Mosher owed the Western
Manufacturing Company $23,591.16, and that the above
assignments and another contemporaneous assignment
of land in Wyoming were taken as a partial payment to
the extent of $9,000. This left due about $14,591.16,
which, it seems from some of the testimony of Mr. Welch,
was settled by capital stock in the Lincoln Gas Company.
We shall not at present go into details of this part of the
transaction, but at this point will give Mr. Welch's ver-
sion of the origin of the indebtedness of $23,591.16.

In June, 1888, the Western Manufacturing Company
was organized as a corporation, and of its capital stock
of $100,000 Mosher was, and during its existence con-

tinued to be, practically the owner of its shares of the par value of $51,000. In August, 1888, Mosher transferred to the company farm machinery and manufactured products, etc., at a valuation of $44,000. This valuation was fixed by an invoice made by third parties, who were, as Mr. Welch testified, not competent to do this work. In 1889 Welch discovered that the inventory had not been correctly made, and within a year or two thereafter he found that the over-valuation and charges for goods not transferred amounted to $9,000, and more. He testified that the purchase price (presumably $44,000) was paid partly in cash and partly in notes, and that all the notes were payable at the Capital National Bank but one, which was payable at Boston, Mass. He was not able to say how much was paid in cash and how much in notes. The original notes given by the Western Manufacturing Company ran four months and were frequently renewed, and, notwithstanding the fact that the discrepancies in the invoice were known, these notes were paid at the Capital National Bank without any attempt to secure a reduction because of the mistakes in the invoice. While Mr. Welch did not ask to have credits on the notes, he testified that he frequently asked Mosher to pay the difference above indicated, and was put off with promises of Mosher that he would pay. In 1889 the Western Manufacturing Company paid dividends on its stock, likewise in 1890, but these payments did not, as Mr. Welch thought, extend into 1891. These dividends were at the rate of two per cent per month, for whatever time they were made, and Mosher thus received a thousand dollars per month. The discrepancies of the aggregate amount of $9,000 in the invoice were, however, not settled. Of the alleged amount of $23,591.16 due from Mosher to the Western Manufacturing Company, $9,000 was made up as above described, leaving $14,591.16 still to be accounted for. The testimony of Mr. Welch with reference to the history of this item was, in part, as follows: "Mr. Mosher owned a majority of the stock in the Western

Manufacturing Company, and he dominated the policy of that business, because it wasn't necessary to call a meeting of the directors or trustees to make or pass a resolution or do anything, because he would have his way there, as well as he would outside the meeting of the directors or trustees. The result would have been the same, because he owned $50,000 worth of the stock on the books of the company and Maxwell, the assistant cashier of the bank, owned $1,000, which stood in his name, but Mosher said he owned that stock and that gave him $51,-000 worth of stock.

"Q. Court: The capital stock was $100,000?

"A. Yes, sir. In 1889 there was a rival cooperage establishment, or rival cooperage company, incorporated in Omaha to manufacture cooperage, and Mr. Mosher was fearful that it would injure our business, and we thought so to the extent that we took steps to stop the erection of that plant, and it cost us $14,640.40, and I paid it, or the Western Manufacturing Company paid it, and I charged it to him, and that amount with the two amounts I have given you makes the $22,591.16."

While Mr. Welch speaks of two amounts to be added to the cost of preventing the existence of a rival cooperage plant, there was but one amount so added, though it may have been made up of two classes of charges. Mr. Welch testified that he protested against the movement to exclude another cooperage establishment from rivalry, and that Mosher agreed that the necessary expenses for this should be charged to him and that, individually, he would pay it. The above accumulations of rebates necessary to silence the rival cooperage business were paid in 1890 and 1891. There were other rebates connected with the manufacturing at the penitentiary, but as they were not clearly stated, and as Mr. Welch admitted that some of them were fictitious, we shall not attempt to describe them, especially as they do not seem, necessarily, to enter into this controversy.

We shall now take up the sale of the gas stock, and to

illustrate Mr. Welch's method of testifying we shall copy
his answer when this subject was entered upon.   He
said: "I got some other stuff from him,—some truck that
don't appear in this account.   If I get into this account
and bring the books up here I will have to go into the
history of the Western Manufacturing Company and the
prison contract, and the whole business will be spread up
here for me to explain, and all things in that account,
and show what these charges consist of and how it was
balanced and the transactions backwards and forwards
for four or five years and after he was sentenced to the
penitentiary.   There are charges there that I furnished
his wife to buy the necessaries of life, and there are
charges there that have been settled in different ways
by him or his friends.   I don't think it is necessary to
take up all that stuff, because it has nothing to do with
this case."   Later, Mr. Welch testified that, for the bal-
ance, after $9,000, because of the assignments, had been
credited, he got some gas stock of the Lincoln Gas Com-
pany.   In his testimony still later, and after a searching
cross-examination, Mr. Welch described the manner in
which this gas stock was transferred to the Western
Manufacturing Company.   Very much condensed, his
statements were to the effect that Mosher had repre-
sented that this stock was worth sixty to seventy cents
on the market; that he would give the Western Manu-
facturing Company long time on it at six per cent in-
terest, and finally, that in October, 1892, Mosher handed
Welch a $53,500 package of the stock, which Welch
placed in the safe of said company.   With the exception
of a short time in which Mosher had this stock for some
temporary purpose of his own it remained in that safe.
The price at which Mosher offered to sell this stock was
sixty cents on the dollar of its par value.   Welch testi-
fied that the bulk of this stock was to be applied on the
sum which Mosher owed the company; that he himself
undertook to pay Mosher the value of $20,000 stock, and
the remainder, $33,500, was to be applied on the indebt-

edness of the company. Mr. Welch said that of the $10,-000 to be paid for $20,000 in gas stock he had paid $5,000 to some one, he did not know to whom, but he thought it was to Henry Mansfield, a relative of Mosher. This witness did not remember to whom the other $5,000 was paid. In the books of the Western Manufacturing Company there were the following entries with reference to this transaction: "Stock Lincoln Gas Co. Bills payable $37,100; gave our notes as follows: $5,000, $7,100, $10,-000, $10,000, $32,100." It appears from the testimony of Mr. Welch that the purchase of the gas stock was not closed up till January 23, 1893, when Mosher, before daylight, came to Mr. Welch's sick room and made known to him the failure of the Capital National Bank two days before, and thereupon, without parley, the deal for the gas stock was closed.

In view of the fact that Mosher practically owned $51,000 par value of the $100,000 stock of the Western Manufacturing Company and, as Welch said, dominated its management, the transaction should be closely scrutinized, and careful scrutiny in no degree tends to diminish reasons for suspicion. The company paid its notes to Mosher and paid him many thousands of dollars in dividends at the same time that he was indebted to it. He was its president. In October, 1892, when the Capital National Bank was hopelessly insolvent, Mosher intrusted to Welch over $53,000 par value of stock, worth, as agreed between them, sixty cents on the dollar, and this stock was held without any agreement that would make it the property of the Western Manufacturing Company. Two days after the doors of the Capital National Bank had closed, and before daylight in the morning, in a sick room at that, the transfer of this stock, it is claimed, was consummated between the president of the company acting for himself and Mr. Welch acting as manager and secretary of the company. But this, according to the books of the company, paid none of its debts. For Mosher's stock there seems to have been received for the benefit of

Mosher $10,000 in the equivalent of cash.   There was also received $32,500 in notes of the manufacturing company. It is perhaps not very material what was done with these notes, but Welch says that, without being paid, they came back into his possession and were consumed in the untimely fire to which we have heretofore referred.   In April following the transfer of the gas stock an effort was made by Mosher to transfer the matter involved in this controversy to this same company.   At that time Mosher was in the custody of an officer and Welch was compelled to procure the transfer under these conditions. Again, in July following, and under similar conditions, another assignment of this same litigated cause of action was made, and in this assignment it was recited that it was as security for whatever Mosher owed the company of which he was president and of which he owned more than one-half the capital stock.   In his testimony Mr. Welch admitted that, even after the final assignment and after the account of the company with Mosher had been balanced, he, as said secretary and manager, filled several requisitions of Mosher for $50 each, and charged the same to Mosher's account with the company.   At the times when the above assignments were being made the company was owing over $125,000 and, from the evidence, we judge, must have been insolvent.   Under these circumstances we have no hesitation in saying that the attempted assignments from Mosher, which are in dispute in this case, were absolutely void.   The transfer by the Western Manufacturing Company to plaintiff of its rights conveyed nothing, for it had nothing to convey.

The answer of Mr. Holdrege and his associates interested adversely to the receiver was filed March 25, 1895. The answer and cross-petition of the receiver was filed April 4, 1895, and the reply thereto on the same day.   The trial began the day following and, though Mr. Holdrege did not reply, the issues were presented as though he had put in issue the averments of the answer and cross-petition of the receiver.   Mr. Harvey testified that the

receiver had never insisted on Mr. Holdrege answering as garnishee, and that Mr. Holdrege had told him that he had a set-off of $4,500. The only evidence introduced to establish the facts of the issue of an attachment, the service of garnishment process, the rendition of judgment, and, in truth, any proceedings was a certificate as follows:

"In the Circuit Court of the U. S., District of Nebraska.

"KENT K. HAYDEN, RECEIVER
  OF THE CAPITAL NAT. BANK
  OF LINCOLN,                          No. 39.   Q.
            v.
CHARLES W. MOSHER.

"I, Elmer D. Frank, clerk of the circuit court of the United States for the dist. of Nebraska, do hereby certify that on the tenth day of Jan., 1894, said plaintiff recovered judgment against said defendant for the sum of $84,294.48 and costs of suit; that on the 18th day of May, 1894, an execution was issued in said case, and on the 28th day of May, 1894, said execution was returned by the United States marshal for said district indorsed, 'no property found.'          ELMER D. FRANK, *Clerk*."

We have carefully examined the testimony in this case and have not been able to find any evidence sufficient to hold Mr. Holdrege liable as garnishee for any sum other than was in the Capital National Bank at the time it closed. On this there has been a dividend of fifteen per cent, and the receiver testified that possibly there might be another ten per cent dividend, but no more. Under these circumstances it is not deemed advisable to hold this case for the making up of issues between Mr. Holdrege and the receiver. The conclusion reached, with regard to other matters involved, disposes of all questions in which other parties are interested, and accordingly the judgment of the district court is

REVERSED AND THE CAUSE IS DISMISSED.